IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 31, 2021

## GABRIEL BUCHANON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County
No. 277379   Don W. Poole, Judge**

_____

## No. E2019-01989-CCA-R3-PC
_____

The Petitioner, Gabriel Buchanon, was found guilty by a jury of three counts of aggravated rape and one count of aggravated burglary, and he received an effective twenty-three-year sentence. After this court affirmed the Petitioner's convictions on direct appeal, he filed a petition for post-conviction relief contending that trial counsel was ineffective. Following a hearing, the post-conviction court denied the petition, and the Petitioner appeals. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Donna Miller, Chattanooga, Tennessee, for the appellant, Gabriel Buchanon.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Neal Pinkston, District Attorney General; and AnCharlene Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

**Trial**

The underlying case arose in April 2005, when the Petitioner and his uncle, Thaddeus Reid, burglarized a Hamilton County residence and raped the fifteen-year-old victim, whom they encountered inside. *State v. Gabriel Eugene Buchanon*, No. E2018-

00430-CCA-R3-CD, 2009 WL 482743, at *1 (Tenn. Crim. App. Feb. 26, 2009), *perm. app. denied* (Tenn. Aug. 24, 2009). Unaware of the Petitioner's involvement initially, law enforcement investigated and prosecuted Mr. Reid first. *See id.* at *4; *see also State v. Thaddeus Eugene Reid*, No. E2007-01056-CCA-R3-CD, 2008 WL 3875436, at *1 (Tenn. Crim. App. Aug. 21, 2008). However, law enforcement investigated and prosecuted the Petitioner once his familial relationship with Mr. Reid and their shared residency in the area where the crimes occurred were discovered. *See Gabriel Eugene Buchanon*, 2009 WL 482743, at *5. The victim positively identified the Petitioner by his voice, *id.* at *3, and, according to the search warrant affidavit in the record, law enforcement sought a search warrant to obtain a sample of the Petitioner's blood approximately one year after the offenses occurred. In addition to citing the victim's voice identification of the Petitioner, the search warrant alleged that Mr. Reid and an accomplice were captured on a gas station's surveillance video stealing a vehicle fifteen hours after the offenses occurred and that law enforcement identified the Petitioner as the accomplice in the video. Law enforcement matched the DNA derived from the Petitioner's blood sample to a DNA profile found on a towel used in the offenses. *Id.* Mr. Reid pleaded guilty to aggravated burglary at the beginning of his trial, and a jury convicted him of three counts of aggravated rape. *See Thaddeus Eugene Reid*, 2008 WL 3875436, at *2. In a separate trial, the Petitioner was convicted by a jury of three counts of aggravated rape and one count of aggravated burglary. *Gabriel Eugene Buchanon*, 2009 WL 482743, at *1.

The evidence presented at the Petitioner's trial showed that the victim's mother left her home for work at about 8:00 or 8:15 a.m. on April 20, 2005. *Id.* While the victim's mother was at work, the victim called her to inform her that someone broke into their home and raped the victim. *Id.* The victim's mother arrived at their home seven or ten minutes later, and she found the victim on the staircase crying, very nervous, and with a knot on her head and a bruise. *Id.* The victim's mother noticed that the back door was kicked in, that an entire stereo system, jewelry, and the victim's bedspread were missing, that the victim's towel was on the bed, and that a mirror leaned against the wall in the victim's bedroom was turned in a different direction than it usually was. *Id.* The victim told her that someone broke in their home through their back door and raped her. *Id.* The victim's mother reported the victim's descriptions of the perpetrators that "one of them was wearing camouflage" and that "the other was wearing an orange shirt." *Id.* at *2. On cross-examination, the victim's mother acknowledged that her daughter could not remember whether the men had hair at that time, but she explained that the victim gave better descriptions of the men later. *Id.* The victim's mother took the victim to the hospital and then to a rape crisis center, where the victim was examined. *Id.*

The victim testified that at approximately 11:20 a.m., she was bathing her dog in the upstairs bathroom when she heard someone knock on a door. *Id.* She went downstairs, the knocking stopped, and she heard knocking on her neighbor's door. *Id.* As she went back upstairs, she heard a loud noise originating from downstairs. *Id.* She

made her way downstairs and was approached on the stairs by a man she later identified as Mr. Thaddeus Reid. *Id.* At the time of the incident, she did not know Mr. Reid or the Petitioner. *Id.*

According to the victim, Mr. Reid put his hands on her face, told her that he was not going to hurt her, laid her on her bed, and "'told her to be quiet, not to talk so loud.'" *Id.* Mr. Reid tried to pull off her shirt and shorts, and when the victim said, "'I thought you weren't going to hurt me,'" he told her to shut up. *Id.* Mr. Reid tried to take off her shirt and shorts again and began to get angry. *Id.* She testified that she gave a false name and stated that she was twelve or thirteen years old. *Id.* A couple minutes later, another man came upstairs and "'did the same thing to her, which was have sexual contact with her.'" *Id.* She testified, "'They both raped me, beat me with a gun, everything that you can possibly think of when somebody gets raped.'" She explained that both men penetrated her anally, vaginally, and orally, and at one point, the men raped her at the same time. *Id.*

The victim testified that Mr. Reid had a gun. *Id.* at *3. She explained that Mr. Reid asked the other assailant for a gun to hit her with while he was raping her because she was being loud. *Id.* She was hit "'a lot of times'" and the men told her, "'Shut up,'" and, "'I'm not going to hurt you, be quiet, open your legs, do this, do that.'" *Id.* After the attack, the men wiped her body down with household solution from the bathroom. *Id.* The men placed the victim's towel on her head, and the second man said, "'Don't kill her, just make her count to a certain number.'" The victim counted, and the men left, taking her clothing and bedspread with them. *Id.* The victim testified that the attack lasted "'about 30 minutes, 45 minutes'" and took place in her bedroom. *Id.*

The victim called her mother, and she was taken to the hospital and a rape crisis center. *Id.* The victim testified, "'I had the inside of my vagina messed up and I had bruises all on my face.'" *Id.* She testified that she had "'a knot or something inside her ear where she can't hear.'" She had bruises on her knee, but "her face suffered the most visible damage." *Id.* She also stated that her "'rectum part' was 'really messed up,'" and she said her "'vagina and behind were bruised in the inside, blood, blood everywhere.'" *Id.*

The victim testified that she saw Mr. Reid in the mirror during the rape, and she later identified him in a photographic lineup. *Id.* She described Mr. Reid as looking "'very different'" than the second man. She described the second man as "'kind of heavyset, he had hair.'" *Id.* She explained, "'You couldn't tell his face because he had a towel on, but you could see his hair and his neck, like he had braids or something.'" *Id.* She stated that the Petitioner matched her description of the second man, but "'he didn't have the facial hair anymore.'" She testified that Detective Ralph Kenneth Freeman played an audio recording of the Petitioner's voice for her, and she stated that "'it

3

sounded just like'" the second man. *Id.* She identified the towel that was used to cover her head. *Id.*

On cross-examination, the victim admitted that she was unable to identify the Petitioner in a photographic lineup. *Id.* When defense counsel questioned her about inconsistencies between her testimony and statements previously given to law enforcement, the victim testified, "'It's just the day a law enforcement officer tape recorded me, it was so much going through my head and I told him what I could remember and what I couldn't remember.'" *Id.* She testified that "'she had flashbacks all the time,'" and "'it's getting clearer.'" *Id.*

The victim conceded that when she identified the Petitioner's voice, the officer played only one voice for her rather than a "'lineup'" of voices. *Id.* at *4. She admitted that she heard the voice recording approximately one year after the rape occurred and that the officer told her prior to listening to the recording that she would hear the voice of someone believed to be involved in the crimes. *Id.* The victim testified, "'When I heard the tape, I remember[ed] his voice. I knew exactly how he sounded.'" *Id.* She also testified on cross-examination that Mr. Reid's blood was found on her arm, but she did not recall seeing any cuts or blood on the Petitioner. *Id.*

East Ridge Police Department Detective Julius Johnson responded to a call reporting an aggravated rape and aggravated burglary on April 20, 2005, and he processed the crime scene. *Id.* He identified stains on the carpet to the left of the bed, at the head of the bed, and at the foot of the bed, and he collected portions of the carpet for analysis. *Id.* He found a pair of panties on the floor at the foot of the bed, and he collected a rape kit and a pair of socks from the rape crisis center. *Id.* He sent the evidence to the Tennessee Bureau of Investigation ("TBI") for analysis. *Id.* Detective Johnson subsequently received a report from the TBI and obtained a search warrant for a sample of Mr. Reid's blood. *Id.* He obtained the blood and forwarded a sample to the TBI for testing. *Id.* He received another report from the TBI that led him to obtain warrants on Mr. Reid. *Id.* He was unaware of the Petitioner's involvement at the time he began prosecuting Mr. Reid. *Id.*

Chattanooga Police Department Detective Ralph Kenneth Freeman testified that he first suspected the Petitioner was involved in the crimes when he realized Mr. Reid was the Petitioner's uncle and that they shared an address. *Id.* Detective Freeman knew the Petitioner's mother lived at that address and that the Petitioner's brother lived in the area of Chattanooga where the crimes occurred. *Id.* Detective Freeman testified that he met the victim in April 2006. *Id.* He showed the victim a photographic lineup including the Petitioner, but the victim was unable to identify him in the lineup. *Id.* According to Detective Freeman, the victim said the second man had a distinctive voice, so he "'played a tape of [the Petitioner's voice] and she identified him as the person.'" Detective Freeman obtained a warrant to collect a sample of the Petitioner's blood, and he sent the

4

sample collected from the Petitioner to the TBI. *Id.* On cross-examination, Detective Freeman admitted that he only played the Petitioner's voice to the victim and did not present it in a lineup of voices. *Id.* He denied telling the victim before playing the recording that the voice belonged to a suspect. *Id.* He testified, "'When she was asked about this distinctive voice, then that's when I wanted her to listen to the tape, to see if she could identify this distinctive voice, that was going to be it.'" *Id.*

Sexual Assault Crisis and Resource Center Nurse Ardyce Rudolfo testified that she examined the victim on April 20, 2005, approximately six hours after the rape occurred. *Id.* The victim reported that she had been raped orally, vaginally, and anally by two men. *Id.* Nurse Rudolfo testified that the victim told her that "'the first person was the one she met on the stairs with camouflage pants and she was able to see his face some. The second person she identified by his voice and by the fact that she could see gray pants a couple of times.'" *Id.* The victim said that she could distinguish the two men by their voices but that her face was covered, and she was told not to look at them. *Id.* According to Nurse Rudolfo, the victim's injuries included "'a bruise approximately one inch by one and a half inches under the left eye, and a bruise under the right side of the chin that was about [a] half inch to three-quarters of an inch'"; a three and a half by three inch purple abrasion on the left side of the victim's face; "'a three and a half by two inch bruise under the right side of the chin'"; a two inch purple bruise on her left leg; two crescent-shaped lacerations on the right side of the victim's neck; abrasions all around the victim's labia minora; a "'very bright red'" coloration on the opening of the victim's vaginal area; eight tears along the posterior fourchette; and tears and abrasions around the sphincter of the anus. *Id.* at *5-6. Nurse Rudolfo testified, "'[T]here was blood in the rectal folds[,] which is unusual to find.'" *Id.* at *6. Nurse Rudolfo performed a rape kit and concluded that the victim was raped anally, vaginally, and orally. *Id.* at *6.

TBI Agent Charles Hardy examined the forensic evidence in the victim's case. *Id.* The swab of the victim's mouth, anus, and vagina produced no indication of the presence of semen, and he did not find any presence of semen from the toilet paper sample or the victim's panties. *Id.* The swab taken from the victim's breast produced no DNA evidence. *Id.* Agent Hardy discovered that the victim's socks tested positive for human blood, and an analysis of the DNA showed that Mr. Reid was a major contributor and the victim was a minor contributor. *Id.* A swab of blood found on the victim's arm produced a DNA profile that matched Mr. Reid. *Id.*

Agent Hardy also tested a towel used to wrap the victim's head during the offense. *Id.* A blood stain found on the towel tested positive for three DNA profiles. *Id.* The major contributor was an unknown male, and minor contributors were Mr. Reid and the victim. *Id.* When the towel was first tested, Agent Hardy only had Mr. Reid and the victim's DNA profiles to compare, but the next year he received a blood sample from the Petitioner. *Id.* He found that the Petitioner's DNA profile matched the third DNA profile recovered from the towel. *Id.* He testified that "'the probability of an unrelated

individual having the same DNA profile from either the African-American, Caucasian, Southeastern Hispanic or Southwest Hispanic populations, exceeds the current world population.'" *Id.*

The jury convicted the Petitioner of three counts of aggravated rape and one count of aggravated burglary. The trial court sentenced the Petitioner to an effective sentence of twenty-three years of confinement. On appeal, this court affirmed the Petitioner's convictions. *Id.* at *9.

## Post-Conviction Proceedings

The Petitioner filed a pro se petition for post-conviction relief contending that he received ineffective assistance of counsel. As it relates to the issues raised on appeal, the Petitioner claimed in his petition that trial counsel was ineffective because he failed to meet and confer with the Petitioner; fully investigate the evidence against him by interviewing the victim and exploring alternative explanations for the presence of his DNA on a towel left at the crime scene; request a continuance based on a lack of communication with the Petitioner and the Petitioner's expectation that additional evidence would be offered by the defense at trial; present photographs from the gas station surveillance video showing that the Petitioner was clean-shaven and did not have cornrows as stated by the victim; obtain during discovery the victim's statement and the Petitioner's voice exemplar; file pretrial motions to suppress the voice identification and DNA evidence derived from his blood draw; and consult with a voice expert. The post-conviction court held a hearing in August 2019, nearly twelve years after the Petitioner's trial and ten years after the Petitioner filed his pro se petition. In its written order denying the Petitioner relief, the post-conviction court attributed the delay to several continuances either requested by or agreed to by the Petitioner. Trial counsel, Mr. Reid, and the Petitioner testified at the hearing.

The Petitioner's trial transcript, Mr. Reid's trial transcript, the opinion issued by a panel of this court in the Petitioner's direct appeal, the search warrant and accompanying affidavit, trial counsel's fee application, and an audio recording of the Petitioner's hearing testimony were admitted as exhibits to the post-conviction hearing. The search warrant, issued on April 13, 2006, permitted law enforcement to seize a blood sample "sufficient for making serological and DNA comparison with the evidence recovered from the victim." The affidavit supporting the warrant reflects the following:

I, Detective Ken Freeman, hereby affirm that I am a sworn police officer and investigator with the City of Chattanooga Police Department, charged with the duty to assist Detective Julius Johnson, East Ridge Police Department, to investigate a rape which occurred on April 20, 2005. The rape is alleged to have occurred at [the victim's address in] Hamilton County Tennessee.

6

On April 20, 2005 around twelve (12) noon, a female juvenile was raped at gunpoint by two African American adult males. During the course of the rape, both adult males left apparent biological (DNA) evidence at [the victim's residence.]

The female juvenile has identified one suspect, Thaddeus Eugene Reid, by a photo lineup as one of the individuals who raped her vaginally and anally. Thaddeus Eugene Reid was later positively identified as the source of one DNA specimen that was located at [the victim's residence.] A second DNA source was also located at [the victim's residence] and has been determined by the Tennessee Bureau of Investigation not to be from the person(s) of Thaddeus Eugene Reid or the female juvenile. Thaddeus Reid was arrested on three counts of aggravated rape and aggravated burglary in June 2005.

The female juvenile described several physical attributes of the second suspect who is unidentified at present. These include: an African American male, short and stocky and wearing braids or cornrows in his hair.

The female juvenile also heard the second unidentified suspect speak during the course of the rape. He said things to include "We won't hurt you" and "Don't tie her up, make her count."

Fifteen hours after the rape, at approximately three (3) am, Thaddeus Eugene Reid and a second unidentified suspect stole a Green Subaru automobile from the Exxon gas Station on Shallowford Road, Chattanooga, Hamilton County, Tennessee. This automobile theft occurred on April 21, 2005. These actions were recorded on close circuit video as well as by still photographs.

Your affiant has reviewed the still photographs of the automobile theft and positively identified the second unidentified suspect as Gabriel Eugene Buchanon.

Your affiant has identified Gabriel Eugene Buchanon by a Hamilton County booking photo as an African American male standing approximately 5' 09" inches and weighing approximately 250 lbs. Gabriel Eugene Buchanon is also known to wear his hair in braids or cornrows.

Your affiant knows Thaddeus Eugene Reid to be the maternal uncle of Gabriel Eugene Buchanon.

On April 12, 2006, your affiant was present with the female juvenile victim when she heard a voice recording of Gabriel Eugene Buchanon. The female juvenile victim positively identified the voice she heard as the voice of the second unidentified suspect who raped her on April 20, 2005.

The record reflects that the Petitioner's blood was drawn on April 16, 2006, pursuant to the warrant being executed.

Trial counsel stated that he met with the Petitioner on several occasions to discuss the case with him while he was incarcerated. Trial counsel's fee application reflects meetings with the Petitioner for 1.30 hours on November 20, 2006, 1.70 hours on February 19, 2007, 0.20 hour on February 20, 2007, and 0.30 hour on March 28, 2007. However, the Petitioner was released on bond prior to trial, and trial counsel encountered difficulties meeting with him once that occurred. Trial counsel explained that he and his staff made documented efforts to meet with the Petitioner starting in June of 2007 through his trial date. According to trial counsel, his office tried to communicate with the Petitioner and the Petitioner's family to convince the Petitioner to go to trial counsel's office for a meeting. Trial counsel stated, "We made appointments for him, we got confirmation he was going to be there, and then he wouldn't show." Trial counsel testified that he spoke with the Petitioner's family to advise them of changes to the Petitioner's court dates. Trial counsel explained that he called the Petitioner on June 11, 2007, concerning an upcoming trial date, but the Petitioner did not answer. Trial counsel's fee application reflects his attempt to call the Petitioner. Later, he called the Petitioner's mother to have her inform the Petitioner of a court date that had been moved to the next day, and when trial counsel spoke to her again, he advised her that the Petitioner needed to be there. Trial counsel's fee application reflects that he had a telephone conference with the Petitioner for 0.10 hour on June 12, 2007, and he had conferences with the Petitioner for 0.80 hour on June 25, 2007, for 1.30 hours on July 9, 2007, and 0.80 hour on September 11, 2007. The fee application also shows that trial counsel held a telephone conference with Levi Buchanon on December 8, 2006, met with Lewis Buchanon on December 18, 2006, and held telephone conferences with the Petitioner's mother on January 15, 2007, and June 11, 2007.

Trial counsel testified that the Petitioner was arrested for the offenses more than a year after they occurred and after Mr. Reid had already been convicted at trial. Trial counsel stated that he did not attend Mr. Reid's trial and that he did not believe the Petitioner had been charged at the time Mr. Reid was tried. Trial counsel testified that he reviewed Mr. Reid's trial testimony, and he recalled that Mr. Reid testified at his own trial that his accomplice was someone other than the Petitioner, a man named "Black." Trial counsel stated that he tried to meet with Mr. Reid while he was incarcerated after his trial but that Mr. Reid would not approve his visit. On cross-examination, trial counsel testified that he spoke with Mr. Reid's attorney prior to trial and met with her and the district attorney prosecuting the Petitioner's case. Trial counsel sought to meet with

the victim prior to trial, but the victim's mother would not let him talk to her. On cross-examination, trial counsel testified that he was familiar with the victim's testimony from Mr. Reid's trial and that he knew what her testimony would be at the Petitioner's trial based on that familiarity.

Trial counsel discussed the possibility of an alibi defense with the Petitioner, but trial counsel did not recall that the Petitioner ever provided him information that he could present as an alibi. Trial counsel testified that he would have filed a notice if the Petitioner gave him information about an alibi. He believed that the Petitioner or his family would have told him about an alibi had there been one. He explained, "The level of disinterest that [the Petitioner] displayed in his case, once he went out on bond, is beyond anything that I have ever experienced in my legal career. He'd just tell me he wasn't there, you need to handle the case."

Trial counsel stated that he was informed by the Petitioner's family that they would bring towels from their residence to try to match them to the towel found at the crime scene when it was introduced as evidence at trial. Trial counsel explained that the purpose of doing so was to permit one of the family members to testify that the towel found at the crime scene was from their residence, which would have suggested to the jury that Mr. Reid took the towel from their residence and would have explained why the Petitioner's DNA was found on it. While the trial was ongoing, the Petitioner's family brought in a bag of towels, but none of them matched the towel that was left at the crime scene. Trial counsel did not recall Mr. Reid stating that he took a towel from the residence where he lived with the Petitioner's mother. Trial counsel testified that he did not subpoena Mr. Reid for the Petitioner's trial because he was "one of the least credible witnesses that you could imagine putting up there; he was all over the place."

Trial counsel recalled that the victim reported that her head was covered by a towel during the incident. He agreed that the identity of the perpetrators was at issue in the case, and he testified that the voice identification and DNA found on the towel were the primary pieces of evidence the State had against the Petitioner.

Trial counsel did not recall discussing at the pretrial conference whether he should remain on the case, but he recalled informing the trial court that he was ready for trial. Trial counsel recalled discussions that occurred on the day of trial between himself, the Petitioner, and the trial court regarding trial counsel's difficulties in meeting with the Petitioner, but he did not recall if he or the Petitioner initially advised the court of the problems. Trial counsel did not move to continue the trial and did not ask the trial court to take the Petitioner into custody. Trial counsel stated that he was prepared for trial and explained, "[the Petitioner's] position was always that he was not there. There's very little that he could have told me on the eve of trial . . . that would have assisted me in my preparation."

Trial counsel testified that he did not receive prior to trial a copy of the victim's statement given to law enforcement. He explained that the State was not obligated to provide the statement until the victim testified and that, once the victim testified, he requested the statement and received it, requested a recess to review it, and then cross-examined the victim based on it. Trial counsel recalled playing an audio recording of the statement to highlight the victim's inconsistent statements for the jury. Trial counsel stated that he knew the statement existed before trial, that although he did not specifically recall asking for it, he knew he would have done so, and that he probably did not file a discovery motion to obtain it. He explained that even if he filed a motion for discovery, the State was not obligated to disclose it before trial. Trial counsel did not recall that the victim stated the Petitioner had braids or a similar hairstyle, and he did not recall if he obtained or introduced photographs of the Petitioner taken around the time the offenses took place. On cross-examination, trial counsel did not recall any discussion related to the Petitioner's hairstyle at the time the incident occurred.

Trial counsel recalled that law enforcement used a voice exemplar for the victim to make an identification of the Petitioner about a year after the crime occurred. Trial counsel testified that he was sure he listened to the voice exemplar prior to trial, but he did not have any specific recollection of it. Trial counsel explained that he prepared a motion to suppress, which he did not file because he reached an agreement with the State that the exemplar would not be played at trial. Trial counsel stated, "I desperately wanted the jury not to hear [the Petitioner's] voice, because when you listen to him speak, it makes it exceedingly obvious why she would have been so certain about her identification of his voice." He stated that the Petitioner had "a unique way of speaking, a unique way that his mouth forms the words and the sounds come out." Trial counsel continued, "[the Petitioner's voice] kind of comes from the top of the back of his mouth[,] . . if you heard it, you'd know who you were listening to and you'd know that you'd heard that voice before. I can still hear his voice in to my head." On cross-examination, trial counsel reiterated the strategic importance of ensuring the Petitioner's voice was not played during trial.

Regarding the search warrant to obtain a sample of the Petitioner's blood, trial counsel agreed that the warrant was supported by the crime's circumstances, that the victim stated that the second suspect made several statements to her during the crime, including, "We won't hurt you," "don't tie her," and "make her count," that surveillance video captured Mr. Reid and a second suspect stealing a vehicle from a gas station fifteen hours after the crime occurred, that the law enforcement officer reviewed still photographs from the video and identified the Petitioner as being involved in the theft, that Mr. Reid is the Petitioner's uncle, and that the officer had obtained from the victim a voice identification of the Petitioner. On redirect examination, trial counsel agreed that the search warrant also detailed that the Petitioner was known to wear his hair in braids or cornrows and that the victim testified that the second perpetrator wore his hair in braids. Trial counsel did not recall whether a photograph of the Petitioner showed that he did not

10

have braids or cornrows and instead had a clean-shaven head. Trial counsel did not recall looking at surveillance video or still photographs from the video, and he did not consult with a voice expert.

Mr. Reid, the Petitioner's uncle, testified that he was tried separately from the Petitioner for the offenses. He agreed that he testified at his trial that the Petitioner was not involved in the crime and that he provided information to police about who the perpetrator was. Mr. Reid testified that he knew the other perpetrator as "Black," that he did not know Black well, and that they knew each other for at least three months through their mutual drug use. He testified that he could not identify Black in photographs shown to him by law enforcement. On cross-examination, he testified that he did not know where Black lived, did not know anything about him, and just agreed to break into the victim's residence with him. Mr. Reid agreed that he testified at his trial that he had "nothing to do with what happened to" the victim. He did not call the police. He testified that he knew Black raped the victim but he stopped him by yelling at him. He stated that he injured himself kicking in the door and was bleeding. Mr. Reid agreed that photographs of himself and Black were admitted at trial. On cross-examination, Mr. Reid testified that only he and Black were present at the gas station.

Mr. Reid did not recall what occurred between the crime and the moment he and Black were captured by the gas station's surveillance camera. Mr. Reid confirmed that he and Black broke into the residence to steal property and sell the property to obtain money for drugs. According to Mr. Reid, he was afraid of Black and looked at him differently after seeing him rape the victim. However, he acknowledged that he stayed with Black long enough to sell the property and obtain a portion of the money to buy drugs. Mr. Reid explained that he was willing to put up with Black's company to get high because he was addicted to crack cocaine. In response to the court's questioning, Mr. Reid testified that he lived with the Petitioner's mother right before the incident happened off and on for probably close to a year. He stated that he stayed with her after the incident and then moved in with his parents.

Mr. Reid agreed that a towel was taken from the residence where he lived with the Petitioner's mother and left at the victim's home. He denied trying to cover for the Petitioner. He testified that the Petitioner was clean-shaven at the time of the offenses and did not have braids or cornrows. Mr. Reid stated that he was not aware of any attempts made by trial counsel to meet with him and said he would have answered any of trial counsel's questions. On cross-examination, Mr. Reid agreed that as family, he and the Petitioner were "expected to take up for each other." He testified that he had spoken to the Petitioner since the Petitioner's trial while being transported on the bus and while being held in cells. He denied discussing the case with the Petitioner or the Petitioner's mother.

The Petitioner testified that he was originally tried in the underlying case about ten years prior to the hearing. He was not present at Mr. Reid's trial, and he first learned about the case when law enforcement visited him at his grandfather's house. The Petitioner recalled that law enforcement brought him to the police station and drew blood from him pursuant to a search warrant. On cross-examination, the Petitioner denied giving consent for law enforcement to draw his blood sample.

The Petitioner testified that trial counsel was appointed to represent him when he was incarcerated pending trial. According to the Petitioner, trial counsel met with him in jail two times for approximately three minutes each meeting. The Petitioner testified that he did not want trial counsel to represent him because trial counsel "talk[ed] crazy to [him]," which he described as trial counsel telling him, "I know you did something or something like this or something" and pointing to the Petitioner's face. On cross-examination, the Petitioner testified that his negative sentiment toward trial counsel began while he was incarcerated because trial counsel only visited him a couple of times, did not give the Petitioner witnesses' statements, and did not obtain his medical records.

The Petitioner testified that he hired an attorney other than trial counsel to represent him at a bond hearing, in which his bond was lowered to $350,000. The Petitioner testified that he made bond the same day, but he did not know how long that was prior to trial. On cross-examination, the Petitioner testified that he began seeking to hire another attorney once released on bond because of the difficulty of doing so while incarcerated. He did not recall whether trial counsel represented him at the bond hearing or that trial counsel was present during the hearing. The Petitioner testified that he informed the trial court that he was trying to hire another attorney. He agreed that he was released on bond for a period of seven months between February 2007 and his September 2007 trial date. Once he was released on bond, the Petitioner recalled that he had been working somewhere at the time of the offenses and broke his leg working with heavy equipment. He testified that he had a cast on his leg at the time the crimes occurred and that he did not realize that until he was out on bond.

The Petitioner testified that he tried to hire another attorney prior to trial and was in the process of obtaining the money to do so when his trial started. He testified that he advised the trial court of his dissatisfaction with trial counsel on the morning of trial. He stated that he was interested in his case but was not interested in trial counsel representing him and that he discussed his innocence with trial counsel. On redirect examination and in response to the post-conviction court's questioning, the Petitioner testified that he intended to pay the other attorney $18,000 within a week had he been granted a continuance.

On cross-examination, the Petitioner testified that trial counsel made a couple of appointments to meet at his office, but the Petitioner told trial counsel that he was trying to hire another attorney. The Petitioner then testified that trial counsel met with him

12

twice in jail for approximately four minutes each meeting and made no appointments to meet with him once he was released. He testified that trial counsel's secretary called him once, but that he told her that he was trying to hire another attorney. The Petitioner confirmed that he told the trial court why he wanted a continuance, including that trial counsel did not subpoena his witnesses. According to the Petitioner, he had worked out a deal with a new attorney and was supposed to ask the trial court for a week's continuance of his trial, but he was forced to go to trial that day.

The Petitioner testified that he did not participate in the crimes and that he was not present at the scene when they occurred. He stated that he did not know when the incident occurred, but he knew when Mr. Reid was arrested for the crimes. The Petitioner recalled learning at a later time that he was captured by a gas station's surveillance video hours after the incident occurred. The Petitioner acknowledged being at the gas station with Mr. Reid but stated he was only dropping Mr. Reid off and that he could not recall if Black was there. The Petitioner testified that he saw a surveillance video recording from the gas station. He stated that his hair was short and that he had never had braids in his life. He denied knowing what had occurred at the victim's residence when he was at the gas station, and he testified that Mr. Reid never mentioned anything to him about it. The Petitioner stated that Mr. Reid was on drugs at that time and that the Petitioner was asked to drop him off at the gas station. On cross-examination, the Petitioner confirmed that he was dropping Mr. Reid off there, but he could not recall whether Mr. Reid asked him to do so. Upon further questioning, the Petitioner clarified that he was dropping Mr. Reid off at the Petitioner's mother's residence, that the gas station is right down the street from there, and that he stopped to get gas. The Petitioner testified that Mr. Reid exited the vehicle and that the Petitioner exited the vehicle to pump gas. The Petitioner could not recall whose car he drove at that time.

The Petitioner testified that he did not know how to determine where he had been at the time the offense occurred because he did not know when the crime occurred. On cross-examination, the Petitioner agreed that he presently knew when the crime occurred and that he could not remember when he broke his leg. He testified that Mr. Reid lived at the Petitioner's mother's residence and that the Petitioner stayed there on and off around that time.

The Petitioner testified that he asked trial counsel about Mr. Reid and another witness testifying at his trial, but trial counsel did not call them as witnesses at trial. The Petitioner stated that he asked trial counsel to obtain medical records regarding his leg injury, but trial counsel did not obtain those records to his knowledge. According to the Petitioner, he advised trial counsel about his hairstyle at the time the crimes took place and discussed with trial counsel the gas station video. The Petitioner testified that trial counsel had a copy of the video from discovery, that trial counsel showed the video to the Petitioner, and that trial counsel did not address the video at trial.

The Petitioner testified that trial counsel did not discuss with him that he had a distinctive voice or that the victim was only given one voice exemplar when she identified him. He testified that he realized that only one voice exemplar was used when one of the State's trial witnesses testified that he told the victim who the Petitioner was before playing the audio for her. The Petitioner testified that he informed the court before trial that trial counsel did not meet with witnesses with whom he asked him to meet. The Petitioner indicated that he was trying to have his trial continued so he could investigate what he was doing on the day the crime took place. The Petitioner testified that he never asked Mr. Reid to lie for him and say that the Petitioner was not at the crime scene. The Petitioner believed that it would have made a difference had trial counsel met with the Petitioner's witnesses and utilized the ideas he had. He stated that he was not aware trial counsel had asked his family to bring towels from his residence, but he also recalled that it occurred on the first or second day of trial.

Following the hearing, the post-conviction court entered a written order denying the Petitioner's request for relief. Regarding the claim that trial counsel did not meet with the Petitioner and failed to request a continuance on that basis, the post-conviction court credited trial counsel's testimony and records that he had several lengthy meetings with the Petitioner and that the Petitioner did not cooperate after his release on bond. The court found that there was sufficient communication between trial counsel and the Petitioner, and it found that trial counsel was not deficient.

The post-conviction court found that trial counsel was not deficient in investigating the case, finding that trial counsel attempted to interview the victim but her mother would not permit it. The court found that trial counsel attempted to match towels brought by the Petitioner's family to the one found at the crime scene but that his efforts were unsuccessful. The court noted that the Petitioner conceded he was unaware of trial counsel's efforts to discover an exculpatory reason for the presence of DNA on the towel left at the victim's residence, namely, that Mr. Reid had taken the towel from their residence and used it during the crime. The court found that neither Mr. Reid's trial testimony nor his hearing testimony supported an "exculpatory reason for the presence of the [P]etitioner's DNA on a towel at the scene." The court found that the Petitioner's testimony that his leg was injured at the time of the offenses lacked credibility. The court found that trial counsel was not deficient in his efforts to investigate alternative explanations for the presence of the Petitioner's DNA on the victim's towel and that the Petitioner failed to show prejudice.

The post-conviction court found that trial counsel was not deficient in failing to obtain discovery because he requested the victim's statement from the State before trial and the State did not have an obligation to provide it before trial. The post-conviction court noted that trial counsel reviewed the victim's testimony from Mr. Reid's trial and

that, when the victim's statement was admitted into evidence at the Petitioner's trial, trial counsel moved for a recess and used it extensively in cross-examination.

The post-conviction court noted that it did not find the Petitioner's voice to be "particularly distinctive," but it found that the Petitioner failed to demonstrate prejudice regarding trial counsel's failure to suppress the voice identification because the evidence showed that there was no ground for suppressing it. The court found that trial counsel agreed with the State to not move to suppress the victim's voice identification in exchange for it not being played at trial and that trial counsel appeared to be familiar with it because of his testimony that it would strengthen the voice identification at trial. The court also found that the Petitioner failed to show prejudice regarding his claim that the trial counsel failed to suppress the DNA evidence collected from his blood sample. The court found that there was no basis to consult a voice expert, and it found that the Petitioner failed to show prejudice because there was no expert testimony presented at the hearing.

## ANALYSIS

The Petitioner contends that he received ineffective assistance of counsel because trial counsel failed to meet and confer with the Petitioner; fully investigate the evidence against him by interviewing the victim and exploring alternative explanations for the presence of his DNA on a towel left at the crime scene; request a continuance based on a lack of communication with the Petitioner and the Petitioner's expectation that additional evidence would be offered by the defense at trial; present photographs from the gas station surveillance video showing that the Petitioner was clean-shaven and did not have cornrows as stated by the victim; obtain during discovery the victim's statement and the Petitioner's voice exemplar; file pretrial motions to suppress the voice identification and DNA evidence derived from his blood draw; and consult with a voice identification expert. The State responds that the post-conviction court properly denied the Petitioner relief. We agree with the State.

A petitioner may request post-conviction relief by asserting grounds alleging that his "conviction or sentence is void or voidable because" it abridged his constitutional rights provided by the Tennessee or the United States constitutions. T.C.A. § 40-30-103. To obtain post-conviction relief, a petitioner must prove the allegations of fact made in the petition by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the post-conviction court's findings of fact are conclusive unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). "[Q]uestions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001) (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). Additionally, appellate courts may not "substitute their own inferences for those drawn by the trial court." *Id.* (citing *Henley*, 960 S.W.2d at 579). This court

reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013) (citations omitted).

A criminal defendant has a right to the assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to assistance of counsel inherently guarantees that counsel's assistance is "effective." *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). To prove that counsel was ineffective, a petitioner must show that (1) counsel performed deficiently and (2) such deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88.

To establish deficient performance, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. This standard requires a petitioner to demonstrate that the "services rendered or the advice given" were "'below the range of competence demanded of attorneys in criminal cases.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Counsel must have made errors so serious that counsel was not functioning as the "'counsel'" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Measuring counsel's performance requires giving deference to counsel's decisions, and courts must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 669. Accordingly, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland* 466 U.S. at 689). The "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Adequate preparation includes counsel's "duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Burns*, 6 S.W.3d at 462 (quoting *Strickland*, 466 U.S. at 691). Counsel's decision to not investigate must be assessed by courts "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

To demonstrate that a counsel's deficient performance prejudiced the defense, a petitioner must prove "'a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different.'" *Dellinger*, 279 S.W.3d at 294 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Because a petitioner must establish both deficiency and prejudice to prove ineffective assistance of counsel, a court need not address both prongs where the petitioner has failed to establish one of them. *See Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The Petitioner claims that trial counsel was ineffective by failing to meet and confer with him. The post-conviction court credited trial counsel's testimony and records that he had several lengthy meetings and that the Petitioner did not cooperate after his release on bond. We defer to the post-conviction court's findings that the Petitioner's testimony lacked credibility. *See Fields*, 40 S.W.3d at 456. The court found that there was sufficient communication between trial counsel and the Petitioner. Accordingly, the Petitioner failed to show that trial counsel was deficient with respect to his claim that trial counsel failed to meet and confer with him.

The Petitioner next claims that trial counsel failed to fully investigate the evidence against him by interviewing the victim and exploring alternative explanations for the presence of his DNA on a towel left at the crime scene. The post-conviction court found that trial counsel was not deficient because he attempted to interview the victim but her mother would not permit it. The court found that trial counsel attempted to match towels brought by the Petitioner's family to the one found at the crime scene. The Petitioner failed to establish during the hearing that the towel from the victim's home matched any of the towels from his home. Rather, the testimony from the victim's mother at trial indicated that the towel used in the offenses belonged to her and the victim.

Although the Petitioner maintains on appeal that trial counsel could have called Mr. Reid to explain the presence of the Petitioner's DNA on the towel, trial counsel testified that Mr. Reid refused to meet with him and that trial counsel decided not to call Mr. Reid as a witness because he lacked credibility. The court found that neither Mr. Reid's trial testimony nor his hearing testimony supported an "exculpatory reason for the presence of the [P]etitioner's DNA on a towel at the scene." Accordingly, the Petitioner has failed to establish that trial counsel was deficient or that any deficiency resulted in prejudice.

The Petitioner also argues that trial counsel failed to discover evidence of medical records suggesting that the Petitioner's leg was in a cast at the time of the offense; however, the court found that the Petitioner's testimony regarding this injury at the time of the offense lacked credibility. Moreover, the Petitioner failed to present the medical records he claimed supported his testimony, and, in the absence of those records, we cannot conclude the Petitioner suffered prejudice. The Petitioner has failed to

17

demonstrate that trial counsel's performance was deficient or that any deficient performance prejudiced his defense.

The Petitioner claims that trial counsel was ineffective by failing to request a continuance supported by lack of communication and the Petitioner's belief that trial counsel was going to offer additional evidence in his defense. Trial counsel testified that he was prepared for trial and that there was little the Petitioner could have told him immediately before trial that would have assisted him. As discussed above, the trial court found that Mr. Reid's testimony would not have been exculpatory and that the Petitioner's testimony regarding his leg injury lacked credibility. The Petitioner has not demonstrated that trial counsel was deficient or that any deficiency resulted in prejudice.

The Petitioner claims that trial counsel was ineffective by failing to present at trial photographs from video captured by the gas station surveillance system. He claims the photographs would have shown his general appearance within fifteen hours of the crimes and that he did not have braided hair. Trial counsel testified at the hearing that he did not recall whether a photograph showed the Petitioner had a shaved head rather than cornrows or braids. We note that the Petitioner did not present the photographs as exhibits during the post-conviction hearing that he claims support his contention that his hair at the time of the offense did not match the victim's description of the perpetrator. Furthermore, trial counsel questioned the victim extensively on cross-examination regarding her description of the perpetrators. Even assuming the photographs showed the Petitioner did not have braided hair, the evidence presented at trial, namely, the victim's voice identification of the Petitioner, the Petitioner's DNA found on the victim's towel, and the Petitioner's relation to Mr. Reid and their association together at the gas station a short time after the crimes occurred overwhelmingly supported the Petitioner's guilt. Because he has not shown that there was a reasonable probability the admission of the photographs as evidence would have changed the outcome of his trial, the Petitioner has not demonstrated prejudice.

The Petitioner argues that trial counsel failed to obtain the victim's statement and the Petitioner's voice exemplar during discovery. Trial counsel reviewed the victim's testimony from Mr. Reid's trial and used the statement once it was admitted into evidence at the Petitioner's trial to cross-examine the victim. The Petitioner did not demonstrate what information trial counsel could have obtained or how obtaining it prior to trial would have affected the outcome of the trial. The Petitioner did not show that trial counsel was deficient for failing to obtain it or that any deficiency prejudiced his defense.

Regarding the voice exemplar used in the victim's identification, the Petitioner did not demonstrate that trial counsel failed to discover it. Trial counsel testified that he recalled that law enforcement used a voice exemplar to obtain an identification of the Petitioner and that he was sure he listened to it. Trial counsel testified in detail regarding

18

his opinion of the distinctiveness of the Petitioner's voice and his strategy to ensure the jury did not hear it. The evidence establishes that trial counsel reviewed the voice exemplar prior to trial. The Petitioner has failed to establish deficiency or prejudice.

The Petitioner contends that trial counsel failed to file pretrial motions to suppress the voice identification and the DNA evidence derived from his blood draw. Trial counsel testified at the hearing that he did not file a motion to suppress the voice identification because he formed an agreement with the State not to move to suppress it in exchange for the State's agreement that the voice exemplar would not be played at trial. Because the identification was not offered as evidence at trial, the Petitioner has not shown the failure to suppress it prejudiced his defense. Regarding the suppression of the DNA evidence, the Petitioner has not cited to any authority suggesting the motion would have succeeded, and he did not introduce the voice exemplar used in the identification as evidence to the post-conviction hearing. Therefore, the Petitioner has not shown that his defense was prejudiced.

Finally, the Petitioner contends that trial counsel failed to consult with a voice expert. The Petitioner did not offer the testimony of an expert witness at the hearing. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 758 (Tenn. 1990). Absent any testimony from a voice expert at the hearing, the potential prejudice resulting from the lack of that testimony at trial cannot be ascertained under the evidence presented by the Petitioner in this case. *See id.* Thus, the Petitioner has failed to establish deficiency or prejudice.

## CONCLUSION

Based upon the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE